# In the United States Court of Federal Claims

No. 07-739 T

(E-Filed:  February 13, 2012)

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| INTERSPORT FASHIONS WEST, INC., | ) | |
| | ) | Motion for Summary Judgment; |
| Plaintiff, | ) | 26 U.S.C. § 482; 26 C.F.R. § |
| v. | ) | 1.482-1 |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

Karen M. Borg, Chicago, IL, for plaintiff.[1]

Jacob E. Christensen, with whom were John A. DiCicco, Principal Deputy Assistant
Attorney General, David I. Pincus, Chief, and G. Robson Stewart, Assistant Chief, Court
of Federal Claims Section, Tax Division, United States Department of Justice,
Washington, DC, for defendant.

## OPINION AND ORDER

HEWITT, Chief Judge

        Before the court are the Motion of the United States for Summary Judgment and
Brief in Support Thereof (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.)
25, filed March 6, 2009, to which defendant attached Defendant's Proposed Findings of
Uncontroverted Fact (defendant's Proposed Facts), Dkt. No. 26, filed March 6, 2009; the

---

[1]  Cheryl Tama Oblander argued on behalf of plaintiff Intersport Fashions West, Inc. (plaintiff or
Intersport).  See Notice of Appearance, Docket Number (Dkt. No.) 59, filed January 27, 2012;
Oral Argument of January 30, 2012, Argument of Ms. Cheryl Tama Oblander at 3:33:25-
3:54:37, 4:27:18-4:50:13.  (The oral argument held on Monday, January 30, 2012 was recorded
by the court's Electronic Digital Recording (EDR) system.  The times noted in citations to the
oral argument refer to the EDR record of the oral argument.).

Brief of Intersport Fashions West, Inc. in Opposition to the Motion of the United States for Summary Judgment (plaintiff's Response or Pl.'s Resp.), Dkt. No. 47, filed November 16, 2011, to which plaintiff attached Plaintiff's Proposed Findings of Uncontroverted Facts in Support of Its Opposition to the Motion of the United States for Summary Judgment (plaintiff's Proposed Facts), Dkt. No. 45, filed November 16, 2011, and Plaintiff's Response to the United States' Proposed Findings of Fact (plaintiff's Response to Defendant's Proposed Facts or Pl.'s Resp. Facts), Dkt. No. 46, filed November 16, 2011; and the Reply Brief of the United States in Support of Its Motion for Summary Judgment (defendant's Reply or Def.'s Reply), Dkt. No. 52, filed December 15, 2011.

For the following reasons, defendant's Motion is GRANTED.

I.    Background[2]

    A.    Factual Background

This action concerns a claim for a refund of corporate tax to a controlled company stemming from restructuring expenses that had been incurred by its parent company.

Plaintiff Intersport Fashions West, Inc. (plaintiff or Intersport) is an American corporation that designed and distributed motorcycle apparel in the United States.  Def.'s Mot. Ex. 2 (Plaintiff's Supplemental Response to Interrogatories) 123[3] ("[Intersport] designed motorcycle apparel and distributed products to wholesalers under third-party brands or brands of sister companies . . . .").  Intersport was purchased by a publicly traded German company, Eurobike Aktlengesellschaft (Eurobike), in 1999, Deposition of John L. Flynn (Flynn Dep.) 14:8-17, 19:8-13; Pl.'s Resp. Facts 2, and between 1999 and 2003 Intersport was wholly owned by Eurobike, Pl.'s Resp. Facts 2.[4]

---

[2]  The facts contained in this section and in this opinion are only those pertinent to the timeliness issue raised in the briefs or background information helpful to understand the positions of the parties.  Facts cited to the filings of only one party do not appear to be in dispute.

[3]  In referencing the exhibits attached to the Motion of the United States for Summary Judgment and Brief in Support Thereof (defendant's Motion or Def.'s Mot.), Dkt. No. 25, the court provides the exhibit number, if available, and the Bates numbers of the relevant pages.  Two attachments to defendant's Motion, the Declaration of Jacob Christensen and the deposition of John Flynn were not assigned exhibit numbers, however.  Therefore, if citing these attachments, the court provides the page and line numbers.

[4]  Eurobike Aktlengesellschaft (Eurobike) may more accurately be described as plaintiff's grandparent company.  Deposition of John L. Flynn (Flynn Dep.) 19:1-21:17 (explaining that, as of September 30, 2002, Eurobike owned 100 percent of a company known as Eurobike Verwaltungs, which in turn owned 100 percent of Intersport).

Around 1999, Eurobike borrowed heavily to acquire two wholesale motorcycle apparel companies, Schuh and DIFI.  See Flynn Dep. 24:4-26:11.  "Eurobike thought that they would have the wholesalers engaged in the distribution of motorcycle apparel . . . ."  Id. at 24:17-19.  Unfortunately for Eurobike, these wholesale businesses also sold their apparel to retailers that competed directly with some of Eurobike's retail subsidiaries.  Id. at 24:22-25:4.  Eurobike sold its wholesale apparel companies by 2001, but it continued to carry a sizeable debt of approximately 140 million euros related primarily to its prior wholesale acquisitions.  See id. at 25:5-26:11.

Between 2001 and 2003, several European banks--creditors of Eurobike-- requested that Eurobike hire consultants to restructure its operations and improve its liquidity.  Id. at 26:16-27:16.  Eurobike acquiesced and retained consultants for the years 2001, 2002 and 2003, spending €5,205,305, €8,436,406 and €4,400,460, respectively, on consulting fees and other expenses of restructuring its business.  Pl.'s Resp. Facts 3.

In 2001 plaintiff paid a $40,041 "insurance charge" to Eurobike, which it claimed as a deduction on its 2001 return.  Id. at 4; see also Def.'s Mot. Ex. 2 (Plaintiff's Supplemental Response to Interrogatories) 123; Def.'s Mot. Ex. 12 (2001 Amended Tax Return) 452.[5]  In 2002, plaintiff paid a $526,468 "management fee" to Eurobike, which it claimed as a deduction on its 2002 return.[6]  Pl.'s Resp. Facts 4, 8; Def.'s Mot. Ex. 8 (2002 Tax Return) 348, 365, 376.[7]

---

[5]  On plaintiff's amended 2001 tax return, it characterized this amount as a "management fee expense" that was part of its insurance expense.  Def.'s Mot. Ex. 12 (2001 Amended Tax Return) 452.

[6]  Plaintiff's 2002 tax year ended on September 30, 2002, and its 2002 tax return, with extensions, was due on June 15, 2003.  Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 649-50.  Plaintiff's 2002 tax return was signed on June 13, 2003, Def.'s Mot. Ex. 8 (2002 Tax Return) 348, and was received and deemed filed by the IRS on June 22, 2003, id.; Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 650.

[7]  Related to the parties' dispute, but not material to this decision, is the apparent agreement of the parties that a payment referred to as a "management fee" was paid by plaintiff to Eurobike in 2002 for "certain services rendered by Eurobike in 2002."  Pl.'s Resp. to the United States' Proposed Findings of Fact, Dkt. No. 46, at 4.  The parties disagree about the nature of the work for which the management fee was paid, specifically the relationship--if any--between the management fee and Eurobike's restructuring expenses.  Compare Defendant's Proposed Findings of Uncontroverted Fact, Dkt. No. 26, at 3, with Plaintiff's Proposed Findings of Uncontroverted Facts in Support of Its Opposition to the Motion of the United States for Summary Judgment, Dkt. No. 45, at 5.

In July 2003 Eurobike filed for bankruptcy in Germany.  Flynn Dep. 27:15-16, 44:4-6.  Intersport was then acquired through a stock purchase by the Fairchild Corporation (Fairchild) in November 2003.  Id. at 45:3-11, 46:15-20.

On June 22, 2004 the Internal Revenue Service (IRS) received plaintiff's 2003 tax return.  Def.'s Mot. Ex. 9 (2003 Tax Return) 389.  On its 2003 tax return, plaintiff claimed deductions that it classified as "management fees" and "legal & consulting" fees that were "based on its purported allocable share of the restructuring expenses incurred by Eurobike in 2003."  Pl.'s Resp. Facts 9 (quoting statement from defendant's Proposed Facts).

In February 2005 the IRS selected Intersport for audit, indentifying the 2001, 2002, and 2003 tax years for examination.  Id. at 10; Flynn Dep. 50:17-20.  At the audit, John Flynn, the Chief Financial Officer of Fairchild, represented plaintiff, Flynn Dep. 13:6-11, and communicated with the IRS examiners regarding plaintiff's intent to file claims for allocations relating to the 2001 and 2002 tax years, see id. at 52:20-53:3.  One of the IRS examiners requested that plaintiff postpone the filing of its amended tax returns (on which it would claim for allocations) until after the conclusion of the audit.  Id. at 53:4-15, 71:17-21.  In response, plaintiff prepared memoranda to the file relating to its claims, which it provided to the IRS examiners at the beginning of the audit.  Id. at 53:7-10.  Plaintiff waited until after the audit to file its amended claims.  Id. at 55:14-20.

As a result of the audit, on August 29, 2005, plaintiff received additional assessments with respect to tax years 2001 and 2002, Def.'s Mot. Ex. 11 (IRS Tax Examination Changes) 449-50, which it subsequently paid, Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 651.

On September 22, 2005 the IRS received plaintiff's amended tax returns for its 2001 and 2002 tax years.  Def.'s Mot. Ex. 12 (2001 Amended Tax Return) 451; Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 478; see Pl.'s Resp. Facts 10.

On plaintiff's 2001 amended return, plaintiff claimed an allocation of $1,332,411 in expenses which, if allowed, would result in a $393,992 decrease in its 2001 tax liability.  Def.'s Mot. Ex. 12 (2001 Amended Tax Return) 451-52.  On its 2002 amended return, plaintiff claimed an allocation of $1,621,273 in expenses which, if allowed, would result in $583,354 decrease its 2002 tax liability.  Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 478-79; see also Pl.'s Resp. Facts. 10.  The claimed allocations did not include the 2001 "insurance charge" and the 2002 "management fee," which had been paid to Eurobike and claimed as deductions on the original returns for those tax years.  Compare Def.'s Mot. Ex. 12 (2001 Amended Tax Return) 452-53, and Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 472-80, with Def.'s Mot. Ex. 7 (2001 Tax Return) 335, and Def.'s Mot. Ex. 8 (2002 Tax Return) 365, 376.

4

The IRS disallowed the deductions claimed on the amended returns for the 2001 and 2002 tax years on the grounds "that they were prohibited under 26 C.F.R. § 1.482-1(a)(3) because plaintiff had not claimed them on a timely filed tax return.  Pl.'s Resp. Facts 11 (quoting defendant's Proposed Facts and agreeing with the quoted statement). The IRS allowed the deductions (with minor adjustments) for tax year 2003, however, which had been claimed on plaintiff's original 2003 return and were based on plaintiff's purported allocable share of the restructuring expenses that Eurobike had incurred in 2003.  See id.; Def.'s Mot. Ex. 3 (Plaintiff's Response to Interrogatories) 206.

B.   Procedural Background

Plaintiff filed its Complaint in this court on October 22, 2007, requesting a "refund of corporate income taxes for fiscal year September 30, 2001 [(2001 tax year)] in the amount of $393,992 and for fiscal year September 30, 2002 [(2002 tax year)] in the amount of $583,354" and "applicable interest."  Compl. 1-2.[8]

---

[8]  Counsel for Intersport submitted supplemental briefing explaining why Intersport is a proper party in this action in light of its involvement in the Fairchild bankruptcy proceedings. Supplemental Statement of Intersport Fashions West, Inc., Dkt. No. 57.  Plaintiff's counsel explained as follows:

1.   On March 18, 2009, The Fairchild Corporation ("Fairchild") and sixty (60) of its affiliates (together, the "Fairchild Debtors") commenced voluntary Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware captioned The Fairchild Corporation, et al., Bankr. D. Del. Case No. 09-10899 (CSS).  Intersport was one of the Fairchild affiliates that commenced such a case.

2.   Although the cases were commenced as Chapter 11 cases, the Fairchild Debtors did not reorganize.  Instead, the Fairchild Liquidating Trust (the "Liquidating Trust") was created for the purpose of conserving, protecting, collecting and liquidating assets for the benefit of the creditors of the Fairchild Debtors.

3.   On or about December 17, 2009, the United States Bankruptcy Court for the District of Delaware entered the Order Confirming Second Amended Joint Plan of Liquidation of The Fairchild Corporation and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, as Amended [Docket No. 887].  The Plan became effective on January 7, 2010 (the "Effective Date["]).

4.   The Plan provided for, among other things, the substantive consolidation of the assets and liabilities of all of the Fairchild Debtors and the transfer of all of those assets to the [Liquidating Trust].

5.   The Plan further provided that the corporate existence of certain Debtors and non-Debtor companies owned by any of the Debtors, including Intersport, shall continue on and after the Effective Date for the limited purpose of facilitating the Liquidating Trust's recovery of assets.

On October 29, 2008 this court issued an opinion dismissing plaintiff's refund claim for the 2001 tax period for lack of subject matter jurisdiction. Intersport Fashions W., Inc. v. United States (Intersport), 84 Fed. Cl. 454, 463 (2008). The court found that plaintiff had not rebutted the presumptive validity of the IRS assessments, id. at 457, and that plaintiff had not satisfied the full-payment rule because it had outstanding tax assessments against it relating to principal, interest, and penalties for the 2001 tax period at the time that it filed its Complaint, id. at 462-63.

On March 6, 2009 defendant filed a motion for summary judgment on plaintiff's remaining claim for a refund relating to the 2002 tax period. Def.'s Mot. 1. On March 24, 2009, the court stayed the case pending plaintiff's bankruptcy proceedings. March 24, 2009 Order, Dkt. No. 28, at 1.

Following the submission of a joint status report by the parties that stated that "the United States Bankruptcy Court for the District of Delaware entered an [o]rder confirming the Plan of Liquidation" for plaintiff and a number of other companies also affiliated with Fairchild, Joint Status Report, Dkt. No. 32, at 1, the court lifted the stay on June 22, 2011, June 22, 2011 Order, Dkt. No. 33, at 1.

Plaintiff filed its Response to defendant's Motion on November 16, 2011, Pl.'s Resp., and defendant filed its Reply in support of its Motion on December 15, 2011, Def.'s Reply. The court held oral argument on defendant's Motion telephonically on Monday, January 30, 2012 at 3:30 p.m. Eastern Standard Time.

II.     Legal Standards

    A.     Jurisdiction

---

6.      Pursuant to the Plan, responsibility for prosecuting litigation actions of the Debtors, including Intersport, vested in the Trustees of the Liquidating Trust. The Trustees need not obtain an order or approval of the Bankruptcy Court for actions taken in connection with any such litigation.

7.      Accordingly, Intersport continues the prosecution of this case in accordance with the authority vested in the Liquidating Trust.

Id. In addition, plaintiff's counsel provided the Declaration of Donald E. Miller, Dkt. No. 63-1, at 1. Mr. Miller states that he is the "Full-Time Operational Trustee of the Fairchild Liquidating Trust," that he is "authorized to assent to prosecuting litigation actions of the Debtors, including Intersport," and that the "Liquidating Trust assents to Plaintiff, Intersport Fashions West, Inc. prosecuting this claim for a tax refund for the tax year ended September 30, 2002." Id. at 1-2.

The United States Court of Federal Claims (Court of Federal Claims) has jurisdiction over federal tax-refund claims pursuant to the Tucker Act, 28 U.S.C. § 1491 (2006).  The Tucker Act states:

> "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

28 U.S.C. § 1491(a)(1).

The original jurisdiction of the Court of Federal Claims over suits for the recovery of internal revenue taxes is concurrent with that of the United States district courts.  28 U.S.C. § 1346(a)(1)(2006).  Specifically, concurrent jurisdiction exists over claims for (1) "the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected," (2) "any penalty claimed to have been collected without authority," and (3) "any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."  Id.

In order to bring a claim before the Court of Federal Claims, the taxpayer must have fully paid the disputed tax principal and have submitted a claim for a refund to the IRS.  See 26 U.S.C. § 7422 (2006) (stating that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . until a claim for refund or credit has been duly filed with the Secretary"); Shore v. United States, 9 F.3d 1524, 1527 (Fed. Cir. 1993) (interpreting the United States Supreme Court's (Supreme Court) decision in Flora v. United States, 362 U.S. 145 (1960), to mean that full-payment rule applied to "the tax portion of any amount assessed," and not to penalties and interest); see Flora, 362 U.S. at 177; 26 U.S.C. § 6511 (2006) (outlining limitations periods for filing IRS claims for credit or refund); 26 U.S.C. §6532(a)(1) (2006) (providing that a suit cannot be brought "before the expiration of 6 months from the date of filing the claim . . . unless the Secretary renders a decision thereon within that time" or more than two years after the Secretary mails the taxpayer a notice of disallowance of the claim).

### B.     Summary Judgment

The court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Rules of the United States Court of Federal Claims (RCFC) 56(a).[9]
A fact is material if it "might affect the outcome of the suit." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." Id. at 248; see also
Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587
(1986).

The moving party has the initial burden of demonstrating "the absence of any
genuine issue of material fact and entitlement to judgment as a matter of law." Crater
Corp. v. Lucent Techs., Inc., 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing Celotex Corp.
v. Catrett, 477 U.S. 317, 323-24 (1986)).[10] This burden may be discharged by "pointing
out . . . that there is an absence of evidence to support the nonmoving party's case."
Celotex Corp., 477 U.S. at 325. There is "no express or implied requirement in Rule 56
that the moving party support its motion with affidavits or other similar materials
negating the opponent's claim." Id. at 323 (emphasis omitted). However, the moving
party must file with the court documentary evidence, such as declarations, that support its
assertions that material facts are beyond genuine dispute, see RCFC 56(c)(1), unless it is
basing its motion for summary judgment on the "absence of evidence to support the
nonmoving party's case," Celotex Corp., 477 U.S. at 325.

The party opposing the motion "must present affirmative evidence in order to
defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257.

---

[9] Effective July 15, 2011, the Rules of the United States Court of Federal Claims (RCFC) were
amended, changing the language and structure of Rule 56 to "reflect the corresponding revision
of [Federal Rule of Civil Procedure 56] that became effective December 1, 2010." RCFC 56,
Rules Committee Note (2011). Defendant's Motion for summary judgment was filed prior to
July 15, 2011 and refers to the prior version of RCFC 56. Because RCFC 56 remains the same
in substance, the court applies the current version of RCFC 56. See RCFC 86 ("These rules and
any subsequent amendments are applicable to all proceedings pending at the time of the adoption
of the revision or amendment or thereafter filed, except to the extent that the court determines
that their application to a pending action would not be feasible or would work injustice, in which
event the former procedure applies.").

[10] The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal
Rules of Civil Procedure (FRCP). See RCFC 56, Rules Committee Note (2008) ("The language
of RCFC 56 has been amended to conform to the general restyling of the FRCP."); Flowers v.
United States, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and
is similar in language and effect."); Champagne v. United States, 35 Fed. Cl. 198, 205 n.5 (1996)
("In general, the rules of this court are closely pattered on the [FRCP]. Therefore, precedent
under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); C.
Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC]
generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c).").
Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

"The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." <u>SRI Int'l v. Matsushita Elec. Corp. of Am.</u>, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc) (citing <u>Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.</u>, 731 F.2d 831, 836 (Fed. Cir. 1984)). It may employ "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." <u>Celotex Corp.</u>, 477 U.S. at 324.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255; <u>see also</u> <u>Matsushita</u>, 475 U.S. at 587-88; <u>Univ. of W. Va. v. VanVoorhies</u>, 278 F.3d 1288, 1295 (Fed. Cir. 2002).

When ruling on a motion for summary judgment, the court may not make credibility determinations or weigh the evidence. <u>Anderson</u>, 477 U.S. at 255 (stating that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment"); <u>Rockwell Int'l Corp. v. United States</u>, 147 F.3d 1358, 1361-62 (Fed. Cir. 1998) (stating that "[i]n determining the propriety of summary judgment, credibility determinations may not be made" (citing <u>SRI Int'l</u>, 775 F.2d at 1116)).  If "there is reason to believe that the better course would be to proceed to a full trial," a trial court may deny summary judgment. <u>Anderson</u>, 477 U.S. at 255.

C.     Section 482 of the Internal Revenue Code

Section 482 of the Internal Revenue Code, 26 U.S.C. § 482, grants authority to the United States Secretary of the Treasury (Secretary) to "allocate gross income, deductions, credits, or allowances" between two or more controlled entities if the Secretary determines that an allocation is necessary either (1) to prevent tax evasion or (2) to clearly reflect income.  <u>See</u> 26 U.S.C. § 482 (2006).

D.     Treasury Regulation 1.482-1(a)

The regulations promulgated under section 482 state, "The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions." 26 C.F.R. §1.482-1(a)(1) (2011).  The regulations continue, "Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer."  <u>Id.</u>

The section 482 regulations provide a limited right to a controlled taxpayer to report allocable income on a timely income tax return.  26 C.F.R. §1.482-1(a)(3) (2011). More specifically, the regulation subsection titled "Taxpayer's use of section 482" states:

If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions. Therefore no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions.

Id.

III.    Discussion

The issue for summary judgment is whether plaintiff may report deductions from a controlled transaction that would decrease plaintiff's taxable income on an amended return filed after the due date, considering extensions, of the original return. For the reasons that follow, the court concludes that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. See RCFC 56.

A.    Jurisdiction

The court has jurisdiction over plaintiff's remaining refund claim pursuant to 28 U.S.C. § 1491 and 26 U.S.C. § 1346 because plaintiff filed a timely claim before the IRS and timely filed suit in this court after fully paying the amount of tax assessed. Under 26 U.S.C. § 6511, a taxpayer must file a claim for refund "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." 26 U.S.C. § 6511. The taxpayer must then file suit no earlier than six months after filing a claim before the IRS and no later than two years after the Secretary has mailed a notice of disallowance to the taxpayer. See 26 U.S.C. § 6532.

Plaintiff's original 2002 tax return was received by the IRS on June 22, 2003. Def.'s Mot. Ex. 8 (2002 Tax Return) 348. In 2005 plaintiff was audited and assessed additional taxes and interest for its 2001 and 2002 tax years, Def.'s Mot. Ex. 11 (IRS Tax Examination Changes) 449-50, and plaintiff paid the additional amounts, the sum of $14,442.66, on November 10, 2005, see Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 651. After it was audited, plaintiff filed an amended return for the 2002 tax year, which was received by the IRS on September 22, 2005,[11] on which

---

[11]  It may be the case that the initial IRS claim was made even earlier. Mr. John Flynn, the former chief financial officer of the Fairchild Corporation who prepared Intersport's 2002

plaintiff claimed a $1,621,273 deduction for tax year 2002 that would result in a refund of $583,354 for that tax year. Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 478-80; see also Compl. 1. The IRS disallowed plaintiff's claim on May 26, 2006 and plaintiff filed its Complaint in the court on October 22, 2007. Compl. 1.

The court has jurisdiction over plaintiff's refund claim relating to the 2002 tax year because the tax was paid, Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 651, and plaintiff filed suit in this court on October 22, 2007, Compl. 1, a date within two years of the IRS's May 26, 2006 disallowance of plaintiff's refund claim.

    B.    The Plain Language of Treasury Regulation 1.482-1(a)(3) Bars Plaintiff From Reporting Deductions on an Untimely or Amended Return that Would Decrease Its Taxable Income

In this case, the plain meaning of the Treasury Regulations is controlling. See Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning."). Subject to the limited right to report a claimed allocation[12] contained in Treasury Regulation 1.482-1, a controlled taxpayer may not affirmatively use section 482 of the Internal Revenue Code or compel the Commissioner of the Internal Revenue Service (Commissioner) to make an allocation or other adjustment. 26 C.F.R. § 1.482-1(a)(3) (stating, with respect to section 482 of the IRC, that "[e]xcept as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions"); see also Morton-Norwich Prods., Inc. v. United States (Morton-Norwich),

---

amended return, states that the IRS requested that he make an "informal claim" rather than filing an amended tax return, Form 1120X, for tax year 2002 while the audit was taking place. Flynn Dep. 13:9-11, 71:17-21. Mr. Flynn referred to two memos to the file that he prepared on February 28, 2005 regarding plaintiff's 2001 and 2002 tax years which appear in the record as Exhibits 4 and 5 to defendant's Motion. Id. at 53:4-15; 71:8-21; see Def.'s Mot. Exs. 4 (2001 Flynn Memo) 244, 5 (2002 Flynn Memo) 271. The record suggests that the IRS examiners conducting the audit saw the memos and rejected plaintiff's claims for additional deductions in tax year 2002. Flynn Dep. 53:16-54:20; Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 479. However, there is no evidence that these memos were sent or forwarded to a regional service center for review, see Michael I. Saltzman, IRS Practice and Procedure, ¶ 11.12[1], at 11-74 (2d ed. 1991), prior to the filing of plaintiff's 2002 amended return, which was received by the IRS on September 22, 2005, Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 478. Ordinarily "[a]ll requests for refunds and amended or superseded returns filed to reduce liabilities previously assessed are filed with regional service centers, where centralized review and classification of income, excise and employment claims are conducted." Saltzman, supra, ¶ 11.12[1], at 11-74.

[12] The court's use of "allocation" is confined to its meaning in Treasury Regulation 1.482-1, namely, "the results of [a taxpayer's] controlled transactions based upon prices different from those actually charged." 26 C.F.R. § 1.482-1(a)(3) (2006).

221 Ct. Cl. 83, 92, 602 F.2d 270, 275 (1979) (describing a 1968 version of 26 C.F.R. § 1.482-1(a)(3) as providing that "section 482 is not available to a taxpayer nor may a taxpayer force the Service to exercise its discretion [under section 482]"); Green Leaf Ventures, Inc. v. Comm'r, 69 T.C.M. (CCH) 2342, 1995 WL 151750, at *14 (1995) ("[A] taxpayer may not affirmatively use section 482; only the IRS may invoke the provisions of section 482 and the regulations promulgated thereunder.").

Under the Treasury Regulations, "a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged."  26 C.F.R. § 1.482-1(a)(3).  However, a controlled taxpayer may not use an untimely return or an amended return to report such results in order to decrease taxable income; in this regard, the regulations state specifically that "no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions."  Id.

Defendant contends that summary judgment is appropriate in this case because Treasury Regulation 1.482-1(a)(3), which "expressly prohibits the use of 'untimely or amended returns . . . to decrease taxable income based on allocations or other adjustments with respect to controlled transactions,'" precludes plaintiff's remaining refund claim for the 2002 tax year.  Def.'s Reply 1.  Defendant argues, "The allocations plaintiff claims for tax year 2002 are prohibited by Treasury Regulation § 1.482-1(a)(3) because plaintiff failed to claim them on a timely tax return."  Def.'s Mot. 12 (some capitalization omitted) (emphasis omitted).

Plaintiff responds that defendant has failed to meet its burden to show that there is no genuine issue of material fact and that summary judgment should therefore be denied. See Pl.'s Resp. 6-7.  In particular, plaintiff argues that the deduction of $1,621,273 claimed on its amended return should be permitted because (1) plaintiff reported its controlled transaction on its "timely-filed original return" because the initially reported deduction of $526,648 was a "mistake in its calculation of its allocation of the additional restructuring expense on its original return, which it corrected on its amended return," id. at 8, (2) taxpayers are generally allowed to correct mistakes by filing amended returns, id., (3) plaintiff substantially complied with the treasury regulations, id. at 9, and (4) granting plaintiff's requested deduction would further the purpose of section 482 of the Internal Revenue Code, id. at 7.

1.    Plaintiff's Amended Return Relating to Tax Year 2002 Is Untimely and Barred by Treasury Regulation 1.482-1(a)(3)

Defendant argues that, because "Plaintiff did not report the $1,621,272 of allocations it claims for 2002 on a timely tax return," the Treasury Regulations prohibit the use of untimely or amended returns that would reduce taxable income.  Def.'s Mot.

12-13.  Plaintiff argues that it "met the requirements of § [1.482-1(a)(3)]" because it reported its "controlled transaction including the management fee with Eurobike on its timely-filed original return for 2002." Pl.'s Resp. 8.

Plaintiff's attempt to add later-claimed allocations to deductions that were claimed over two years earlier on plaintiff's original return in order to secure a tax refund of more than $500,000 is futile.  By its terms, Treasury Regulation 1.482-1(a)(3) does not permit a controlled taxpayer to claim an allocation that would decrease taxable income on an untimely or amended return.  See 26 C.F.R. § 1.482-1(a)(3).  In addition, the Supreme Court has rejected taxpayer arguments that an amended return filed after the close of the filing period, considering any extensions that might be granted, is a timely return.  See Scaife Co. v. Comm'r (Scaife), 314 U.S. 459, 461-62 (1941) (noting that under Haggar Co. v. Helvering, 308 U.S. 389, 395 (1940), "first return" includes a "timely amended return for that year," but holding that the return in Scaife was untimely because it had been filed "after the unextended or statutory due date had expired").

Plaintiff was required to file its 2002 tax return on or before June 15, 2003.  See Def.'s Mot. Ex. 17 (Certificate of Assessments for Tax Year 2002) 650 (noting that, with the grant of an extension, plaintiff's tax return was due on June 15, 2003).  Plaintiff's 2002 tax return was signed on June 13, 2003 and received by the IRS on June 22, 2003.  Def.'s Mot. Ex. 8 (2002 Tax Return) 348.  On its original return, plaintiff claimed deductions that included $526,648 in management fees.  Id. at 376.  More than two years later, in September 2005, plaintiff sought for the first time to claim more than $1.6 million in deductions.  Def.'s Mot. Ex. 13 (2002 Amended Tax Return) 479.  Were these deductions recognized, plaintiff's taxes for the 2002 tax year would be decreased by $583,354, the amount of tax that plaintiff claims is due to be refunded.  See id. at 478, 480; Compl. 1.

Under Scaife, plaintiff's amended return, filed after the due date for the original return, considering extensions, is untimely.[13]  Scaife, 314 U.S. at 461-62.  Because plaintiff attempts to use an untimely return to seek additional deductions that would decrease its taxable income, its claims are barred by Treasury Regulation 1.482-1(a)(3).

2.     Plaintiff's Contention that the Original Filing Was a Mistake Does Not Excuse the Filing of an Untimely Tax Return in This Case

---

[13]  Although the plain language of the Treasury Regulations also appears to bar the consideration of amended returns, the United States Supreme Court (Supreme Court) has held that, in the context of the National Industrial Recovery Act, 15 U.S.C. §§ 701-712 (1934), a first return means "a return for the first year in which the taxpayer exercises the privilege of fixing its capital stock value for tax purposes, and includes a timely amended return for that year." Haggar Co. v. Helvering, 308 U.S. 389, 395 (1940).

Plaintiff argues that "[t]axpayers may file amended returns to correct mistakes in original returns." Pl.'s Resp. 8 (citing United States v. Van Keppel, 321 F.2d 717, 720 (10th Cir. 1963). Defendant counters, correctly, that plaintiff's reliance on Van Keppel is mistaken in view of the Supreme Court's decisions in Scaife, 314 U.S. at 461-62, and Helvering v. Lerner Stores Corp. (Lerner), 314 U.S. 463, 466 (1941). Def.'s Reply 3-6.

In Van Keppel, the case upon which plaintiff relies, the United States Court of Appeals for the Tenth Circuit (Tenth Circuit) held that the IRS Commissioner had abused his discretion in not permitting taxpayers to file an amended return after the close of the filing period. 321 F.2d at 720. However, the court in Van Keppel relied on the Supreme Court's decision in J.E. Riley Inv. Co. v. Comm'r (Riley), 311 U.S. 55, 58 (1940), which affirmed the IRS's disallowance of a taxpayer's amended return that was filed after the expiration of the filing period on the grounds that it was not a "first return," but noted that the case was not one of a mere error in computation, id. at 57-58.

The question left open in Riley of whether an amended return filed after the close of the filing period could cure a mistake such as a computation error was resolved by two later Supreme Court decisions. See Scaife, 314 U.S. at 461-62; Lerner, 314 U.S. at 466. In these companion cases, the Court held that where a statute required taxpayers to declare the value of their stock on a "first return," a taxpayer could not file an amended return "after the unextended or statutory due date had expired," even to correct a mistake in computation. Scaife, 314 U.S. at 460-62; see also Lerner, 314 U.S. at 466 (observing that "[t]he hardship resulting from the misplaced decimal point is plain").

That plaintiff's reporting of $526,648 may have been a mistake, an issue that defendant does not concede, Def.'s Reply. 7-12,[14] does not permit plaintiff to file an amended return in this case where the Treasury Regulations expressly prohibit the filing of an untimely or amended return, see Scaife, 314 U.S. at 461-62; Lerner, 314 U.S. 466.

      3.     Plaintiff Has Not Shown that It Is Entitled to Relief on the Basis of the Doctrine of Substantial Compliance

Plaintiff contends that a deduction is proper in this case because the doctrine of substantial compliance directs that a deduction should be allowed if the taxpayer "substantially complied with the regulation" and the regulation is procedural rather than

---

[14]  Defendant contends that there is no evidence in the record to show that plaintiff made a "mistake." Reply Brief of the United States in Support of Its Motion for Summary Judgment, Dkt. No. 52, at 8-10. Defendant argues that, in order to show that plaintiff had made a mistake in its original claimed deductions of $526,648, plaintiff would need to "come forward with some evidence of an actual allocation agreement that was in existence when the original return was filed, and then to demonstrate to the Court precisely how the purported 'mistake in its calculation' occurred." Id. at 11.

substantive in nature.  Pl.'s Resp. 9 (citing <u>Taylor v. Comm'r</u>, 67 T.C. 1071, 1077-78 (1977).  Defendant responds that plaintiff's contention is contrary to applicable law in the United States Court of Appeals for the Federal Circuit (Federal Circuit).  Def.'s Reply 14-15 (citing <u>Credit Life Ins. Co. v. United States</u> (<u>Credit Life</u>), 948 F.2d 723, 726-27 (Fed. Cir. 1991)).

Defendant's statement of the applicable law is correct.  The Federal Circuit has construed the doctrine of substantial compliance narrowly.  In <u>Credit Life</u>, a case also involving a tax refund, the Federal Circuit agreed with a decision by the United States Court of Appeals for the Seventh Circuit, which stated:

> We think the doctrine [of substantial compliance] should be interpreted narrowly, and point out that the courts of appeals owe no special deference to the Tax Court's legal views . . . .  The common law doctrine of substantial compliance should not be allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute.

<u>Credit Life</u>, 948 F.2d at 726-27 (alteration in original) (quoting <u>Prussner v. United States</u>, 896 F.2d 218, 224 (7th Cir. 1990) (en banc)).

Therefore, in order to invoke the doctrine of substantial compliance, plaintiff must show that it had a good excuse for noncompliance and that the regulation was unimportant or the regulation's terms were unclear or confusing.  <u>See</u> <u>Prussner</u>, 896 F.2d at 224-25.  Plaintiff has not pointed to evidence in the record that would support a finding of any of these factors.[15]

Accordingly, plaintiff may not invoke the doctrine of substantial compliance to overcome the plain language of the Treasury Regulations, which prohibits a taxpayer from claiming on an untimely or amended return an allocation that would decrease taxable income.  26 C.F.R § 1.482-1(a)(3).

   4.   Plaintiff's Contentions Regarding the Purpose of Section 482 Do Not Change the Court's Analysis

---

[15]  Plaintiff's assertion that Treasury Regulation 1.482-1(a)(3) is procedural rather than substantive, a determination that the court need not address here, is not sufficient to show that the regulation is unimportant.  <u>See</u> <u>United States v. Boyle</u>, 469 U.S. 241, 249 (1985) ("Deadlines are inherently arbitrary; fixed dates, however, are often essential to accomplish necessary results. The Government has millions of taxpayers to monitor, and our system of self-assessment in the initial calculation of a tax simply cannot work on any basis other than one of strict filing standards.").

Plaintiff views the purpose of section 482 as giving controlled taxpayers "tax parity with uncontrolled taxpayers," and not "disallowing proper deductions of controlled taxpayers." Pl.'s Resp. 7. Plaintiff appears to argue that, because the deduction was allowed by the IRS on plaintiff's 2003 tax return, disallowing the deduction for the 2001 and 2002 tax years would be inconsistent with the purpose of section 482. See id. Defendant does not concede that a deduction would be proper under section 482 and argues that "[i]t is well established . . . that each tax year is a separate claim for tax purposes. Def.'s Reply 12-14 (citing Comm'r v. Sullivan, 333 U.S. 591, 598 (1948)).

As articulated in the Treasury Regulations, "[t]he purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions." 26 C.F.R. § 1.482-1(a)(1). To achieve this end, the Commissioner is empowered to determine "the true taxable income of a controlled taxpayer[,] which is the taxable income which would have resulted to the controlled taxpayer had it in the conduct of its affairs dealt with the other member or members of the group at arm's length." Morton-Norwich, 221 Ct. Cl. at 91, 602 F.2d at 274; see also Aristar, Inc. v. United States, 213 Ct. Cl. 616, 620, 553 F.2d 644, 646 (1977) (stating that "[t]he express language of Section 482 is simple and clearly indicative of its purpose," and that "[w]here two or more entities are owned or controlled by the same interest, the Commissioner is granted discretion to allocate gross income between or among them" once he determines that an allocation is necessary under section 482). In other words, the Commissioner may treat controlled transactions as arms-length transactions, achieving parity between controlled and uncontrolled taxpayers, if he determines that it is necessary to ensure that income is clearly reflected and taxes are not avoided.

Plaintiff's argument that disallowing a deduction for 2001 and 2002 which was permitted in an original 2003 return is inconsistent with section 482 lacks merit. First, the parties agree that the deductions permitted in one tax year do not mandate the same outcome with regard to other tax years. See Def.'s Reply 12-13; Oral Argument of January 30, 2012, Argument of Ms. Cheryl Tama Oblander at 4:45:43-48 ("Each year does stand on its own in the ultimate analysis of whether the deduction can be allowed."). Second, the Commissioner's disallowance does not contravene the purpose of Section 482. Congress, through section 482, gave the Secretary the discretion to "allocate gross income, deductions, credits, or allowances between . . . businesses, if he determines that such . . . allocation is necessary in order to prevent evasion of taxes or clearly to reflect [] income." 26 U.S.C. § 482. Pursuant to the authority granted by section 482, the Secretary promulgated regulations, following proper notice-and-comment procedures, which implemented the statute and delegated to the IRS the authority to make allocations among controlled taxpayers. See Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 34,971-01, 34,971-72 (July 8, 1994) (providing final regulations and directions for submission of comments); 26 C.F.R. § 1.482-1(a)(2) ("The

district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income."); see also Abbot Labs. v. United States, 84 Fed. Cl. 96, 98 n.1 (2008) ("Section 482 empowers the Commissioner of Internal Revenue to allocate income, deductions, and credits between two or more controlled entities, when necessary to prevent tax evasion or clearly to reflect income") (citing, inter alia, Francis M. Allegra, Section 482:  Mapping the Contours of the Abuse of Discretion Standard of Judicial Review, 13 Va. Tax Rev. 423, 424-31 (1994)).  The court cannot say that the Commissioner's actions, following properly promulgated regulations designed to implement section 482, violate the statute.

> C.     Even If Plaintiff Were Not Barred from Seeking Allocations, the Commissioner Did Not Abuse His Discretion in Denying Plaintiff's Request

Defendant argues that the Commissioner's rejection of plaintiff's amended return was not an abuse of discretion because the Treasury Regulation 1.482-1(a)(3) "specifically prohibits the use of amended or untimely returns."  Def.'s Reply 3.

As a general rule, taxpayers may not rely affirmatively on the provision of section 482.  See, e.g., Morton-Norwich, 221 Ct. Cl. at 92, 602 F.2d at 275.  And the Commissioner has broad discretion in the area of section 482 allocations if he determines that an allocation is necessary to prevent tax avoidance or to clearly reflect income. Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 654-55, 410 F.2d 1233, 1244 (1969) ("Generally, because the Commissioner is given wide discretion, the taxpayer[s] not only have the burden of overcoming the presumptive correctness of the Commissioner's action but also proving that his section 482 determination . . . was arbitrary or capricious.").

While Treasury Regulation 1.482-1 articulates the limited right of a taxpayer to report "the results of its controlled transactions based upon prices different from those actually charged,"[16] the regulation expressly precludes the taxpayer from doing so on an untimely or amended return.  26 C.F.R. § 1.482-1(a)(3).  In light of the plain language of the section 482 regulations, the Commissioner's decision to disallow plaintiff's claimed allocation was not an abuse of discretion.

IV.    Conclusion

---

[16]  In general, the purpose of the temporary regulations promulgated in 1993 appears to have been the clarification of earlier assertions "that taxpayers were not permitted to report results that differed from transactional results in order to reflect an arm's length result on the tax return." Intercompany Transfer Pricing Regulations Under Section 482, 58 Fed. Reg. 5253, 5265 (Jan. 21, 1993).  The temporary regulations stated, "Section 482-1T(a)(3) provides, as do the current regulations, that only the district director may apply the provisions of section 482, but clarifies that this restriction does not limit the taxpayer's ability to report its true taxable income."  Id.

For the foregoing reasons, defendant's Motion for summary judgment is GRANTED.  The Clerk of Court shall ENTER JUDGMENT for defendant.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge